UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CIRILO ALCANTARA,

                        Petitioner,                **MEMORANDUM AND ORDER**

        -v-                                       19-CV-3686 (RRM) (LB)

EARL BELL, SUPERINTENDENT,

                        Respondent.
------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

        Cirilo Alcantara, proceeding *pro se*, petitions this Court for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, asserting that the evidence was legally insufficient to support his

May 10, 2013, conviction for criminal sexual act in the first degree and sexual abuse in the first

degree; that his 18-year determinate term of imprisonment was excessive; and that his trial

counsel provided ineffective assistance.   For the reasons set forth below, Alcantara's petition for

a writ of habeas corpus is denied and this action is dismissed.

## BACKGROUND

        On May 30, 2012, petitioner was arrested outside his home after two of his teenaged

stepchildren, F.H. and D.H., reported seeing him rubbing his penis on the naked buttocks of his

five-year-old biological daughter, J.A.  Petitioner was charged with criminal sexual act in the

first and second degrees, incest in the first and second degrees, and other offenses.  In April

2013, after rejecting a plea bargain that would have resulted in nine years' incarceration,

petitioner went on trial in the Supreme Court of the State of New York, Richmond County,

before Justice Robert J. Collini and a jury.

The Prosecution Case

The prosecution presented seven witness at the trial including four members of petitioner's nuclear family:  J.A.; J.A.'s mother, Jesucita Garcia; and the two stepchildren who observed the incident.  The other three witnesses were petitioner's friend and upstairs neighbor, Ruben Rivera, and two first responders:  Police Officer Danielle Donohue and Emergency Medical Technician ("EMT") Lynn McCarthy.

As of May 30, 2012, petitioner and Garcia were living together in a two-family home on Staten Island with Garcia's six children.  Three of those children – sons F.H. and M.H. and daughter D.H. – were born of a prior relationship and were teenagers at the time of the incident.[1] By the time of trial, F.H. was 17 years old and a sophomore in high school, M.H. was 16, and D.H. was 14 and a freshman in high school.  (Garcia: 89; F.H.: 72, 87; D.H.: 30.)[2]  The other three children – J.A. and two boys, J.D.A. and C.A. – were born during Garcia's nine-year relationship with petitioner and were his biological children.  (Garcia: 89–90.)  At the time of trial, J.D.A. was eight, C.A. was seven, and J.A. was six.  (Garcia: 89.)  These three children and D.H. shared a bedroom next to their parents' room, while F.H. and M.H. slept downstairs in the basement.  (D.H.: 52.)

At the time of the incident, Garcia was working as a cook in a delicatessen located within a block of the family's apartment.  (D.H.: 38; F.H.: 78; Garcia: 89.)  She had a split shift which generally required her to work from 8:30 a.m. to 2:00 p.m. and from 6:30 p.m. to 9:00 p.m.

---

[1] Although Garcia and petitioner never married, (Garcia: 98), F.H. and D.H. referred to petitioner as their stepfather during their testimony, (D.H.: 31; F.H.: 74).  Accordingly, the Court will refer to these three children as petitioner's stepchildren.

[2] Numbers in parentheses denote pages in the Trial Transcript (Doc. Nos. 9-1 & 9-2.)  A name preceding a number identifies the witness whose testimony appears on the cited page.

(Garcia: 89.)  Petitioner, then 31 years old, was occasionally employed as a construction worker but did not work on the date of the incident.  (Garcia: 100, 103.)

On the morning of Wednesday, May 30, 2012, Garcia dressed J.A. in her school uniform: a white shirt and a dark blue skirt.  (Garcia: 90–91.)  J.A. had an afterschool program that day which ended at 5:00 p.m., and Garcia left home to 4:30 p.m. to pick her up.  (Garcia: 91.)  When she left, petitioner was asleep and, according to Garcia, had been sleeping all day.  (Garcia: 91.)  He was still asleep when Garcia left for work at 6:30 p.m., leaving the older children to care for the younger ones.  (Garcia: 91, 100.)

At some point, petitioner arose and took C.A. to the home of a friend, Josie.  (D.H.: 34; J.A.: 112.)  J.A. asked if she, too, could play at Josie's house but her father refused her request.  (J.A.: 113.)  Around 7:00 p.m., petitioner entered the deli where Garcia worked to buy beer and to ask Garcia for her cell phone.  (Garcia: 92.)  When Garcia told him that she had left her cell phone at home, he returned to their apartment.  (Garcia: 92.)  Judging from his breath, Garcia believed that petitioner was drunk.  (Garcia: 100, 104.)

D.H. testified that petitioner came home around 7:00 p.m., wearing a Hawaiian shirt and khaki pants.  (D.H.: 32, 45, 49.)  D.H. was in the room she shared with her younger siblings, watching television with J.D.A.  (D.H.: 32–33.)  J.A., still in her school uniform, was also in the room, where she had been sleeping for about one hour.  (D.H.: 32–33, 49–50.)

At some point, petitioner, who looked to D.H. like he had been drinking, entered the room and told D.H. to leave.  (D.H.: 32, 46.)  She obeyed and went downstairs, where her two older brothers were playing video games.  (D.H.: 33, F.H.: 73.)  Although D.H. testified that petitioner did not ask J.D.A. to leave the bedroom, she recalled that he came downstairs about five minutes after she did.  (D.H.: 50, 69.)

About two minutes after J.D.A. came downstairs, D.H. alerted F.H. to the fact that C.A. was not yet home and suggested that they go collect him from Josie's house.  (D.H.: 33–34; F.H.: 74.)  D.H. and F.H. then searched the apartment for J.A., intending to take her downstairs so that M.H. could look after her while they went to retrieve C.A.  (D.H.: 34, 51.)  They first looked in the bedroom where she had been sleeping but she was no longer there.  (D.H.: 34; F.H.: 74–75.)  They then resolved to look in their parents' room – the only other upstairs bedroom.  (D.H.: 34; F.H.: 75.)

Although D.H. and F.H. did not agree of whether their parents' bedroom door was completely shut, (F.H.: 75), or just "mostly closed," (D.H.: 52), they agreed that F.H. entered the room, followed closely by D.H.  (D.H.: 35, 45, 52; F.H.: 75, 82.)  There, they saw J.A., wearing only a white shirt, lying face down on the bed.  (D.H.: 36; F.H.: 75.)  Petitioner was completely naked and on top of J.A.  (D.H.: 36–37; F.H.: 76.)  The witnesses disagreed as to which direction petitioner and J.A. were facing.  F.H. testified that both were looking at the wall and away from the door, (F.H.: 76, 83–84), while D.H. remembered that J.A. was facing her as she entered the room, (D.H.: 36).

F.H., D.H., and J.A. all testified that petitioner's penis was in contact with J.A.'s buttocks, though their testimony differed as to some details.  D.H. could not recall if petitioner was rubbing his penis on her cheeks or "in the middle."  (D.H.: 57–58.)  F.H. testified that he saw petitioner's flaccid penis rubbing in between the cheeks, but that the penis was not in her butt.  (F.H.: 76, 82–83.)  J.A., in contrast, testified that petitioner "put his dick in [her] buttock."  (J.A.: 114.)

The witnesses largely agree on what happened next.  F.H. exclaimed, "What the hell are you doing?" or words to that effect.  (F.H.: 82–83; D.H.: 35.)  He entered the room and, being a

lot bigger than petitioner, pushed petitioner off J.A.  (F.H.: 76; D.H.: 35, 53.)  F.H. then picked up the half-naked child, wrapped her in a blanket, and carried her out of the bedroom.  (F.H.: 76; D.H.: 35; J.A.: 114.)

Not wanting his little sister to look at her naked father, F.H. initially took J.A. into the kitchen and then into her bedroom, where he asked M.H. to find her underwear.  (F.H.: 76–77.)  Meanwhile, D.H. stayed in the bedroom and yelled at petitioner, screaming "How could you?" and things to that effect.  (D.H.: 54–55.)  Petitioner did not respond and remained on the bed, where he covered himself with a blanket.  (D.H.: 37, 54–55.)

After yelling for two to five minutes, D.H. went into the kitchen, which adjoined her parents' bedroom.  (D.H.: 35, 55.)  A minute later, petitioner entered the kitchen, wearing only his khaki pants.  (D.H.: 35, 37.)  D.H. resumed yelling at him, accusing him of having sexual intercourse with her half-sister.  (D.H.: 35, 55.)  Petitioner responded by showing her "the middle finger" and asking, "You want to fuck with me too?"  (D.H.: 35–36.)

At some point, F.H., who was still in the bedroom with J.A., yelled at D.H. to call the police.  (D.H.: 35–36, 60–61.)  Although D.H. did not immediately do so and did not demand that he leave, petitioner ran outside.  (D.H.: 36, 58.)  D.H. did not see where he went.  (D.H.: 59.)

All five children then went to their mother's workplace.  (D.H.: 36–37; F.H.: 77; J.A.: 114.)  F.H. carried J.A., who was still wrapped in the blanket.  (D.H.: 38; F.H.: 78.)  En route, D.H. used her cell phone to call the police.  (D.H.: 61–62.)  On arriving at the deli, D.H. went in and called for her mother while the others waited outside.  (F.H.: 78; Garcia: 93.)

According to Garcia, the children arrived at the deli about 40 minutes after petitioner had left the deli.  (Garcia: 92.)  Garcia recalled going outside to find J.A., wearing only a white shirt and underwear, wrapped in a sheet.  (Garcia: 93.)  Garcia and the children then walked home,

calling the police again as they went.  (D.H.: 38; F.H.: 78; Garcia: 93.)  Petitioner was not home

when they returned.  (D.H.: 38; F.H.: 78.)

Officer Danielle Donoghue and her partner responded a few minutes later.  (D.H.: 63, 65;

Garcia: 94.)  There, the police initially approached Rivera, an upstairs neighbor, who was just

returning from an errand.  (Rivera: 139–41.)  Rivera was well-acquainted with petitioner; he had

known him for 17 years, saw him every day or every other day, and considered him a friend.

(Rivera: 138–39, 145.)  Rivera had heard screaming and arguing emanating from petitioner's

apartment and had seen the children leaving as he left to run the errand.  (Rivera:  140.)

Assuming that his neighbors had called the police, he directed the officers to the downstairs

apartment.  (Rivera: 141.)

Donoghue was admitted to the apartment and spoke to J.A. (Donoghue: 126.)  The officer

called for an ambulance, then canvassed the neighborhood with D.H. in an unsuccessful attempt

to locate petitioner.  (D.H.: 38–39; Donoghue: 126–27.)  Meanwhile, Rivera spoke to Garcia,

who told him that petitioner had raped their daughter.  (Rivera: 141–42, 148, 150.)  This angered

Rivera, whose own daughter had been sexually assaulted.  (Rivera: 148–50.)

By the time Donoghue and D.H. returned to the apartment, an ambulance manned by

EMT McCarthy had arrived.  (D.H.: 63; Donoghue: 127.)  An officer carried J.A. into the

ambulance and placed her on the stretcher.  (McCarthy: 130, 135–36.)  When McCarthy asked

the five-year-old if she was in pain, J.A. said her butt hurt.  (McCarthy: 130, 135.)  When

McCarthy inquired as to why, J.A. told her that her daddy put his "thing" in her butt.

(McCarthy: 133.)

The EMT, who testified that it was "not within [her] realm to give [J.A.] any kind of

physical exam following an event like that," did not examine J.A. and, accordingly, did not

6

observe any trauma.  (McCarthy: 133, 135.)  Rather, she transported J.A. and Garcia to

Richmond University Medical Center.  (D.H.: 39; Garcia: 94; J.A.: 114; Donoghue: 127;

McCarthy: 133.)

Donoghue and her partner left the scene after the ambulance departed.  (Donoghue: 127.)

Before she left, however, Donoghue provided Rivera with a telephone number so that he could

contact the officers directly if petitioner returned.  (Donoghue: 127.)  After the police left, Rivera

remained on the front steps of his house because he was afraid petitioner might return and hurt

the children.  (Rivera: 142.)

While sitting on the steps, Rivera heard the sound of a glass bottle falling on the ground.

(Rivera: 142, 148.)  He investigated, shining a light around petitioner's van which was parked in

the driveway, and heard something wiggling underneath the vehicle.  (Rivera: 142, 152.)  When

Rivera looked under the van, he saw petitioner, lying on his back.  (Rivera: 142–43.)  According

to Rivera, petitioner was wearing "[j]ust a pair of pants.  No underwears [*sic*], no shirt, no

socks."  (Rivera: 143.)

Rivera told him to get up and petitioner complied, wiggling out from under the vehicle.

(Rivera: 143.)  Petitioner then approached Rivera and said he needed clothes to leave the state.

(Rivera: 143.)  When Rivera asked why, petitioner twice stated: "Because I did something very

bad."  (Rivera: 143.)

Rivera not only did not provide petitioner with clothes but refused to allow him to leave,

saying "You're not leaving nowhere."  (Rivera: 144.)  Rivera, who was standing between

petitioner and the street, then grabbed petitioner by the arm and indicated that his son was going

to call the police.  (Rivera: 144.)  Petitioner struggled, telling Rivera that he was "not going to

jail." (Rivera: 144, 152.)  Rivera subdued him, throwing him against a fence, slamming him into the van, and knocking him to the ground.  (Rivera:  144.)

D.H. heard some of the interaction between Rivera and petitioner.  D.H. testified that she heard petitioner, whose voice she recognized, in the driveway telling the neighbor to let him through the door.  (D.H.: 40, 59.)  Based on what she heard, D.H. believed that petitioner was attempting to return but that the neighbor would not let him.  (D.H.: 59.)  D.H. did not actually see what happened outside but immediately "freaked out" and called the police.  (D.H. 40, 65.)

Rivera's son also called the police, though he called the number that Donoghue had given him rather than 911.  (Rivera: 144–45; Donoghue: 127.)  He spoke to Donoghue's partner who, in turn, called two other officers who were closer to the scene.  (Donoghue: 127–28.)  When the officers arrived, they handcuffed petitioner and took him into custody.  (Rivera: 145.)

J.A. remained at the hospital until 3:00 the next morning, during which time she was given a "checkup" and may have been questioned further by police.  (Garcia: 94, 101–02; J.A.: 114.)  J.A. recalled telling the police that her daddy put his "thingy" in her butt.  (J.A.: 122.)

According to the hospital records, which were introduced into evidence by the prosecution, the examination found no evidence of sexual abuse.  However, Garcia testified that J.A. complained that "her bum hurt" after she went to the bathroom that night.  (Garcia: 94.)  The next morning, Garcia took J.A. for a more complete examination by a specialist from the Administration for Children's Services ("ACS").  (Garcia: 95.)  The records of this examination were not introduced into evidence and there is nothing in the record to suggest that this examination revealed any evidence of abuse.  Medical personnel did not prescribe any medications for J.A. (Garcia: 102.)

<u>Cross-Examination and the Defense Case</u>

In cross-examining D.H., F.H., Garcia, and Rivera, defense counsel adduced evidence of antipathy between petitioner and his stepchildren.   D.H. readily admitted that she did not have a good relationship with petitioner and that they had not had a good relationship for as long as she could remember.  (D.H.: 48–49.)  She testified that petitioner drank every day and conceded that they fought "a lot," often about things he said to her.  (D.H.: 46, 48.)

While F.H. described his relationship with petitioner as "good and bad at the same time," he testified that petitioner was drinking all day, every day, and that they often argued.  (F.H.: 84, 86.)  He specifically recalled that petitioner screamed and yelled at him and at D.H. for not cleaning the house and for leaving dirty dishes around, and had threatened to disconnect the internet.  (F.H.: 85.)  While F.H. claimed that he did not really care if petitioner got angry at him, he admitted that he did not like it.  (F.H.: 85.)

Garcia testified that petitioner had a good relationship with the older children when he was sober.  (Garcia: 99.)  When drunk, however, he would yell at them, which prompted fights between her and petitioner.  (Garcia: 99.)  According to Garcia, petitioner had been drinking for three days prior to the incident.  (Garcia: 99.)

Defense counsel also asked F.H. and D.H. whether they had spoken to J.A. about the incident in its aftermath.  F.H. testified that he remained with J.A. in her bedroom immediately after the incident but claimed that he said nothing to her during that period.  (F.H.: 86.)  Indeed, both F.H. and D.H. denied having ever spoken to J.A. about the incident, though they admitted having spoken to each other about it.  (D.H.: 66; F.H.: 86.)  According to F.H., those discussion occurred around the time of the incident and he and D.H. had not spoken about the incident for a few weeks prior to their testimony.  (F.H.: 87.)

9

In cross-examining J.A., defense counsel seized upon a subtle shift in the anatomical terms the child had used to describe petitioner's penis.  On direct examination, J.A. testified that he "put his dick" in her buttocks.  (J.A.: 114.)  On cross-examination, J.A. admitted having referred to the penis as a "thingy" when she spoke to police following the incident.  (J.A.: 121.)  When asked who introduced her to the term, "dick," J.A. stated that it was her "brother."  (J.A.: 121.)  However, when defense counsel sought to establish that the brother was F.H., J.A. clarified that it was C.A. who told her about the term.  (J.A.: 121.)

<u>The Defense Summation and the Verdict</u>

In his summation, defense counsel principally argued that J.A. had been "pushed" into accusing petitioner of sexual misconduct by her older half-siblings, F.H. and D.H.  (177.)  He noted that F.H. and D.H. both admitted that they did not like petitioner and that he was constantly yelling and screaming at them.  (183–84.)  He also noted that the siblings' description of events differed with respect to whether the bedroom door was open, which direction petitioner and J.A. were facing, and where they were positioned on the bed when F.H. and D.H. entered the room.  (184–85.)  Defense counsel asserted that the "huge discrepancy" in the siblings' testimony about the "small, important details" of the incident was evidence that the witnesses were "making something up."  (186.)

Defense counsel specifically noted the "lack of medical evidence … [of] any injuries," and posited that J.A. "would have more trauma" and "would be more scared" if she had been assaulted in the manner she claimed.  (177.)  In support of this argument, defense counsel read from the medical records of J.A.'s examination at Richmond University Medical Center, noting that the nurse's assessment showed "basically a negative examination," with no evidence of injury or distress.  (178–79.)  He also noted that the prosecution had not introduced records of

the ACS examination or any "other evidence, scientific or medical, which shows that anything happened here."  (180.)

Defense counsel argued that Rivera had a "bias" because his own daughter had been molested, and implied that this made him inclined to believe Garcia's allegations against petitioner.  (181.)  He argued that D.H.'s testimony regarding the conversation between Rivera and petitioner suggested that petitioner, who could have driven away when he initially left the scene, was attempting to re-enter his apartment when he was assaulted by Rivera.  (182–83.) Noting that Rivera could not have known if petitioner was wearing underwear or not at the time he was apprehended (181), defense counsel tacitly accused Rivera of fabricating his testimony regarding petitioner's admissions.  (182.)

The jury rejected defense counsel's arguments.  It convicted petitioner of both crimes on which it was charged: criminal sexual act in the first degree in violation of New York Penal Law § 130.50(3) and sexual abuse in the first degree in violation of New York Penal Law § 130.65(3). On May 10, 2013, petitioner was sentenced to 25 years' imprisonment and 20 years' supervised release on the first count and to a concurrent term of 7 years' imprisonment and 10 years' supervised release on the second count.

Direct Appeal

Petitioner appealed the judgment of conviction to the Appellate Division of the Supreme Court of the State of New York, which assigned counsel to represent him.  Appellate counsel prepared a brief which raised two issues on petitioner's behalf.  First, it argued that the evidence was legally insufficient to prove petitioner's guilt beyond a reasonable doubt and that the jury's verdict was against the weight of the evidence.  (Brief for Defendant-Appellant (Doc. No. 9-4) at 14–19.)  Second, the brief argued that petitioner's sentence was excessive.  (*Id.* at 20–24.)

Petitioner filed a *pro se* supplemental brief arguing ineffective assistance of trial counsel and alleging that his counsel's performance was deficient in several respects. (*See* Defendant Appellant's *Pro Se* Supplemental Brief (Doc. No. 9-6).) First, petitioner argued that because child witnesses are especially susceptible to suggestion, defense counsel should have interviewed every person who questioned J.A. to determine if suggestive questioning affected her testimony. (*Id.* at 14.) Specifically, petitioner asserted that defense counsel should have interviewed Sandra Lee, a Licensed Clinic Social Worker, and Dr. Yalena Bataykin, both of whom saw J.A. at Richmond University Medical Center; Rose Mary Daniele of the Jane Barker Child Advocacy Center at Brooklyn Hospital, who saw J.A. on May 31, 2012; and an ACS worker, Mr. Williams, who allegedly found the allegations of child abuse to be unfounded. Second, petitioner argued that defense counsel should have called a psychologist to provide expert testimony about "fabrication, suggestibility, and other alternative explanations for the child's testimony or behavior." (*Id.* at 16, 21.)

Third, petitioner faulted defense counsel for failing to investigate what occurred during the time that J.A. was alone with F.H. and D.H. immediately after the incident. (*Id.* at 18.) Petitioner claimed that if defense counsel had thoroughly examined the timeline of events, he would have established that F.H. and D.H. had "a lot of time alone" with J.A. before they went to the deli. (*Id.* at 25.) According to petitioner, this would have created a "strong suggestion of coercion and fabrication." (*Id.*)

Fourth, while acknowledging that J.A. medical records had been introduced in evidence, he faulted defense counsel for failing to investigate and highlight the lack of medical evidence of sexual abuse. (*Id.* at 24.) Fifth, petitioner argued that defense counsel provided ineffective

assistance because he failed to request a trial order of dismissal on legal insufficiency grounds. (*Id.* at 32–33.)

The Appellate Division, Second Department, agreed that petitioner's sentence was excessive and modified the judgment of conviction by reducing the term of incarceration on the top count from 25 to 18 years.  (Decision & Order dated 3/29/2017 (Doc. No. 9-8) at 1.) However, the Appellate Division rejected all of petitioner's other arguments and affirmed the judgment as modified.  While it held that the legal sufficiency claim was unpreserved for appellate review, the Appellate Division nonetheless addressed the merits of that argument, holding that the evidence, viewed in the light most favorable to the prosecution, was legally sufficient to establish petitioner's guilt beyond a reasonable doubt.  (*Id.*)  It also held that the jury's verdict was not against the weight of the evidence.  (*Id.* at 2.)  The Court did not address the specific claims of ineffective assistance alleged in the supplemental brief but simply held that petitioner's contention was "without merit."  (*Id.*)

Petitioner sought leave to appeal the Appellate Division's decision to the New York Court of Appeals.  (Leave Application (Doc. No. 9-9) at 2.)  The Court of Appeals denied leave in an order dated June 12, 2017.  (Order Denying Leave (Doc. No. 9-11) at 2.)  Petitioner did not petition the Supreme Court of the United States for a writ of certiorari.  (Petition (Doc. No. 1) at ¶ 8(g).)

<u>Petitioner's Post-Conviction Motions</u>

Petitioner subsequently filed at least three *pro se* post-conviction motions:  two motions to vacate the judgment of appeal pursuant to New York Criminal Procedure Law ("CPL") § 440.10 and an application for a writ of error coram nobis.  Since petitioner seeks to raise the

13

issues contained in the first of these motions (hereafter, the "First § 440.10 Motion") but not the
issues contained in the other motions, the Court will describe only the First § 440.10 Motion.

That motion was filed on June 4, 2018, almost one year after petitioner's leave
application was denied by the New York Court of Appeals.  The motion argued that trial counsel
provided ineffective assistance by, among other things, failing to adequately investigate the
witnesses' allegations and failing to find and use a report from the Division of Child Welfare and
Community Services which concluded that allegations of abusive conduct by petitioner were
unfounded.  (First § 440.10 Motion (Doc. No. 9-12) at 1.)  In opposition to the motion, the
prosecution pointed out that these same arguments were contained in petitioner's *pro se*
supplemental brief and that the Memorandum of Law in Support of the § 440.10 Motion, (*id.* at
10–49) was essentially excerpted from that brief.  (*See* Affirmation in Opposition to the CPL §
440.10 Motion (Doc. No. 9-13) at ¶ 12.)  The trial court agreed with the prosecution and denied
the motion, holding that the "ground or issue raised upon the motion was previously
determine[d] on the merits upon an appeal from the judgment."  (Decision & Order dated
12/17/2018 (Doc. No. 9-14) at 1 (quoting N.Y. CPL § 440.10(2)(a)).)  Petitioner applied for a
certificate granting leave to appeal the trial court's ruling, but that application was denied by the
Appellate Division on April 2, 2019.  (Decision & Order dated 4/2/2019 (Doc. No. 9-15).)[3]

The Instant Petition

On or about April 23, 2019, petitioner commenced his action by placing a handwritten
petition for a writ of habeas corpus (the "Petition") in his prison mailbox.  (Petition (Doc. No. 1)
at 5.)  The Petition sought review of the grounds raised on direct appeal but also mentioned the
First §440.10 Motion and the two other post-conviction motions  (*Id.* at 4.)  The Petition stated

---

[3] Petitioner also sought leave to appeal to the New York Court of Appeals, but that application was dismissed
because the Appellate Division's order was not appealable.  *People v. Alcantara*, 33 N.Y.3d 1066 (2019) (table).

that when the three post-conviction motions were fully exhausted, petitioner might seek to amend the Petition to add the issues raised in those motions. (*Id.*)

After his First § 440.10 Motion and his petition for writ of error coram nobis were exhausted, petitioner moved to amend his Petition. However, that motion sought to add grounds which were not raised in the post-conviction motions. Accordingly, the Court denied the motion to amend but granted petitioner leave to file a second motion to amend the Petition to include the grounds which had been exhausted in his First § 440.10 Motion and/or petition for a writ of error coram nobis. (Memorandum and Order dated 9/28/2020 (Doc. No. 17) at 13.) The Court also noted that if petitioner wished to raise the grounds contained in post-conviction motions which had not yet been exhausted, he could seek to stay this action and hold it in abeyance until those motion were fully exhausted. (*Id.*)

Petitioner then moved to stay this action and hold it in abeyance until he could fully exhaust claims raised in a second § 440.10 motion and a second application for a writ of error coram nobis. The Court denied that motion, holding that the claims raised in those two post-conviction motions were "plainly meritless" and that it would be an abuse of discretion to grant a motion to stay an action so plainly meritless claims can be exhausted. (Memorandum and Order dated 9/29/2021 (Doc. No. 20) at 19 (citing *Rhines v. Weber*, 544 U.S. 269, 277 (2005).) However, the Court noted that petitioner could "still seek to amend his petition to add the already exhausted claims raised in his other two post-conviction motions" and set a deadline for filing such a motion. (*Id.* at 20.)

Petitioner did not formally move to amend his petition. Instead, petitioner filed a one-page letter stating that petitioner wanted to pursue only the grounds exhausted on direct appeal and in his First § 440.10 Motion. (Letter dated 2/18/2022 (Doc. No. 21).) That letter attached an

"Amended Habeas Petition" which raises three grounds:  the legal sufficiency and excessive sentence claims raised in Appellate Brief and the ineffective assistance claim raised both in the Supplemental Brief and in the First § 440.10 Motion.  In light of petitioner's *pro se* status, the Court will construe petitioner's one-page letter as a motion to amend and grants the motion.  The Court will adjudicate only the three grounds raised in the Amended Habeas Petition.

Almost immediately after the one-page letter and Amended Habeas Petition were filed, respondent's counsel sent the Court a letter stating that respondent did not intend to submit further briefing.  (Doc. No. 23.)  Thereafter, petitioner filed a memorandum of law dated March 9, 2022, (Doc. No. 23), which largely repeats arguments contained in petitioner's earlier submissions.  Since this unauthorized submission is in the nature of a reply, the Court will not consider it in adjudicating the Amended Habeas Petition.

## STANDARD OF REVIEW

In 1996, Congress passed the Antiterrorism and Effective Death Penalty Act ("AEDPA"), P.L. No. 104–32, 110 Stat. 1214, which restricted the ability of federal courts to grant writs of habeas corpus to state prisoners and granted greater deference to state court determinations of both law and fact.  Under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "'Clearly established Federal law' means 'the holdings, as opposed to the

dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"

*Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362,

412 (2000)).  A decision is "contrary to" clearly established Federal law "if the state court arrives

at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the

state court decides a case differently than [the Supreme Court] has on a set of materially

indistinguishable facts."  *Williams*, 529 U.S. at 413.  A decision is an "unreasonable application"

of clearly established Federal law if a state court "identifies the correct governing legal principle

from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a]

prisoner's case."  *Id.*

As the Supreme Court has acknowledged, the standard set forth in § 2254(d) was meant

to be difficult to meet.  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  "Section 2254(d)

reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal

justice systems, not a substitute for ordinary error correction through appeal."  *Id.* at 102–03

(internal quotations marks and citation omitted).  Thus, in order to obtain a writ of habeas corpus

from a federal court, "a state prisoner must show that the state court's ruling on the claim being

presented in federal court was so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at

103.  This is a "highly deferential standard," requiring that state courts "be given the benefit of

the doubt."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).

Where a state court's decision is unaccompanied by an explanation, a habeas petitioner

has the burden of "showing there was no reasonable basis for the state court to deny relief."

*Harrington*, 562 U.S. at 98.  In such cases, a habeas court "must determine what arguments or

theories … could have supported the state court's determination …." *Shinn v. Kayer*, 141 S. Ct. 517, 524 (2020) (internal quotation marks and citation omitted.)  The court then "must assess whether fairminded jurists could disagree on the correctness of the state court's decision if based on one of those arguments or theories." *Id.* (internal quotation marks and citations omitted).

It is "well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  "This is true even where … the state court 'reach[es] the merits of a … claim in an *alternative* holding.'" *McPherson v. Keyser*, No. 20-161-PR, 2021 WL 4452078, at *2 (2d Cir. Sept. 29, 2021) (summary order) (quoting *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990)) (emphasis in *Velasquez*).  However, federal habeas review is not "barred every time a state court invokes a procedural rule to limit its review of a state prisoner's claims." *Cone*, 556 U.S. at 465.  As discussed below, "'[t]he adequacy of state procedural bars to the assertion of federal questions' … is not within the State's prerogative finally to decide; rather, adequacy 'is itself a federal question.'" *Id.* (quoting *Lee v. Kemna*, 534 U.S. 362, 375 (2002)).  Under federal law, state rules are considered "adequate" if they are "firmly established and regularly followed." *Johnson v. Lee*, 578 U.S. 605, 606 (2016) (quoting *Walker v. Martin*, 562 U.S. 307, 316 (2011)).  But there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee*, 534 U.S. at 376.

Generally, "[t]o overcome procedural default, the prisoner must demonstrate 'cause' to excuse the procedural defect and 'actual prejudice' if the federal court were to decline to hear his claim." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1728 (2022) (quoting *Coleman*, 501 U.S. at 750).  In

18

addition, in "exceptional cases involving a compelling claim of actual innocence, … the state procedural default rule is not a bar to a federal habeas corpus petition." *House v. Bell*, 547 U.S. 518, 522 (2006) (citing *Schlup v. Delo*, 513 U.S. 298, 319–22 (1995)).

## DISCUSSION

Legal Sufficiency

The first of petitioner's three grounds for habeas corpus relief – that the evidence was insufficient to establish petitioner's guilt beyond a reasonable doubt – was rejected by state courts on independent and adequate state grounds.  The Appellate Division held that the legal sufficiency claim was "unpreserved," thereby invoking the contemporaneous objection rule set forth in CPL § 470.05(2).  "New York's contemporaneous objection rule 'require[s] at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error.'"  *Hamilton v. Lee*, 707 F. App'x 12, 14 (2d Cir. 2017) (summary order) (quoting *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999)).

"The New York courts' application of their rules regarding the preservation of legal issues for appellate review in criminal cases … constitute independent and adequate state grounds …."  *McPherson*, 2021 WL 4452078, at *2; *see also Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007) ("[T]he procedural bar of § 470.05(2) constitutes an independent and adequate state ground for the Appellate Division's holding.").  First, "there is no question" that the failure to comply with New York's contemporaneous objection rule "constitutes an 'independent' state ground of decision."  *Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003)).  Second, "in accordance with New York case law, application of the state's preservation rule is

19

adequate – *i.e.*, firmly established and regularly followed." *Richardson v. Greene*, 497 F.3d 212, 219 (2d Cir. 2007).

This is not one of those exceptional cases "in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *See Lee*, 534 U.S. at 376. In determining whether a case falls "within that limited category," *id.*, a court considers "(1) whether the alleged procedural violation was actually relied on in the [state] court, and whether perfect compliance with the state rule would have changed the [state] court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had 'substantially complied' with the rule …." *Cotto*, 331 F.3d at 240. Here, as petitioner himself conceded in his *pro se* supplemental brief and in his First § 440.10 Motion, trial counsel did not raise the legal sufficiency issue by making a trial order of dismissal of sufficiency grounds. The New York Court of Appeals has repeatedly "held that a specific objection is required to preserve sufficiency of the evidence claims for appellate review in jury trials." *People v. Santos*, 86 N.Y.2d 869, 870 (1995) (citing cases). And the Appellate Division expressly relied on the contemporaneous objection rule, denying petitioner's legal sufficiency claim as unpreserved. Decision & Order (Doc. No. 9-8) at 1.

Since there is no compelling claim of actual innocence in this case, the Court turns next to the question of whether petitioner has met the cause and prejudice standard. Petitioner has implied that there was cause for the default. "There is no doubt that ineffective assistance of counsel can serve as cause to excuse a procedural default." *Tavarez v. Larkin*, 814 F.3d 644, 650 (2d Cir. 2016) (citing *Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000)). Petitioner's  First §

440.10 Motion specifically argued that his lawyer's failure to preserve the legal sufficiency

argument for appellate review constituted ineffective assistance of counsel.

However, even assuming that petitioner could establish cause, he could not establish

prejudice.  The Appellate Division found that the legal sufficiency argument was not only

unpreserved, but was also without merit because the evidence, viewed in the light most favorable

to the prosecution, was legally sufficient to establish petitioner's guilt beyond a reasonable

doubt.  Since that determination is entitled to deference under AEDPA, petitioner must establish

that it was an unreasonable application of clearly established Supreme Court law in order to

make out prejudice.  *See Tavarez*, 814 F.3d at 650.

Petitioner cannot meet this burden because the evidence adduced at trial was more than

sufficient to make out the crimes of which petitioner was convicted.  In order to prove criminal

sexual act in the first degree in violation of New York Penal Law § 130.50(3), the prosecution

had to establish that petitioner engaged in anal sexual conduct with a person who was under 11

years of age.  The term "anal sexual conduct" means "conduct between persons consisting of

contact between the penis and anus."  N.Y. Penal Law § 130.00 (2)(b).  In order to prove sexual

abuse in the first degree in violation of New York Penal Law § 130.65(3), the prosecution had to

establish that petitioner subjected a person who was under 11 years of age to "sexual contact."

Under New York law, "sexual contact" means "any touching of the sexual or other intimate parts

of a person for the purpose of gratifying sexual desire of either party."  N.Y. Penal Law § 130.00

(3).

The evidence adduced at trial, viewed in the light most favorable to the prosecution, was

sufficient to establish every element of these two offenses beyond a reasonable doubt. According

to Garcia, J.A. was born on June 23, 2006.  (Garcia: 90.)  She was six years old at the time of

trial, (Garcia: 89), and not yet six during the May 30, 2012, incident.  Both F.H. and D.H. testified that they saw petitioner, completely nude, rubbing his penis on J.A.'s naked buttocks. (D.H.: 36–37; F.H.: 76.)  Although D.H. testified that she could not recall if petitioner was rubbing his penis on her butt cheeks or "in the middle," (D.H.: 57–58), F.H. testified that petitioner's penis was in between the cheeks.  (F.H.: 76, 82.)  And J.A. herself testified that petitioner had "put his dick in [her] buttock."  (J.A.: 114.)  The jury could infer from this evidence that petitioner's penis had at least contacted J.A.'s anus and that petitioner's actions were for the purpose of gratifying his sexual desires.

Sentencing

Ground Two of the Amended Petition argues that petitioner's sentence was excessive. Since "federal habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), petitioner's claim is "cognizable on federal habeas review only if it raises an issue of federal or constitutional law."  *Harris v. Perez*, No. 14-CV-7218 (SLT), 2017 WL 5468782, at *6 (E.D.N.Y. Nov. 13, 2017).  "No federal constitutional issue is presented where … the sentence is within the range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (*per curiam*).

Petitioner was convicted of a class B felony, *see* N.Y. Penal Law § 130.50, and a class D felony, *see* N.Y. Penal Law § 130.65.  Both offenses constituted a "felony sex offense" as defined in New York Penal Law § 70.80.  Accordingly, even though petitioner was a first-time offender, Justice Collins was required to impose a determinate sentence of at least 5 years and no more than 25 years' imprisonment for the class B felony and a determinate sentence of at least 2 years and no more than 7 years' imprisonment for the class D felony.  *See* N.Y. Penal Law § 70.80(4)(a).  In addition, the judge was required to impose a term of supervised release of not

less than 5 years nor more than 20 years for the class B felony and a term of not less than 3 years nor more than 10 years for the class D felony.  *See* N.Y. Penal Law § 70.45(2-a).

The sentence originally imposed by Justice Collins fell at the very top of the range authorized by New York law.  The judge sentenced petitioner to 25 years' imprisonment and 20 years' supervised release for the class B felony of criminal sexual act in the first degree.  He also sentenced petitioner to a concurrent term of 7 years' imprisonment and 10 years' supervised release for the class D felony of sexual abuse in the first degree.  Since these sentences were "within the range prescribed by state law," Ground Two does not make out a federal constitutional violation that can be remedied in a federal habeas corpus proceeding.  *See White*, 969 F.2d at 1383.

<u>Ineffective Assistance of Counsel</u>

Under AEDPA, this Court's review of ineffective assistance claims is "doubly deferential."  *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).  First, AEDPA requires federal courts "to accord deference to the state court's ruling on claims of ineffective assistance of counsel."  *Santone v. Fischer*, 689 F.3d 138, 154 (2d Cir. 2012); *see also Hamilton*, 707 F. App'x at 15–16.  A "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  "The state court decision must be 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *White v. Woodall*, 572 U.S. 415, 420 (2014)).

Second, reviewing courts must show deference to the defense counsel's choices at trial pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Harrington*, 562 U.S. at 118; *Rivas v. Fischer*, 780 F.3d 529, 547 (2d Cir. 2015).  In *Strickland*, the Supreme Court set out a two-pronged test for ineffective assistance of counsel claims.  Under the first prong, a petitioner must show that counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  In assessing reasonableness, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. State of La.*, 350 U.S. 91, 101 (1955)).

Under the second prong, a petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  The Supreme Court defines "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.*  In other words, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 446 U.S. at 687).  "[T]he *Strickland* test is conjunctive: '[f]ailure to demonstrate either requirement is fatal to a petitioner's claim' of ineffective assistance of counsel." *Minier v. United States*, No. 16-CR-23 (PAC), 2021 WL 1292820, at *4 (S.D.N.Y. Apr. 7, 2021) (citation omitted); *see Strickland*, 466 U.S. at 697.

In this case, no fairminded jurist could find that petitioner's trial attorney provided ineffective assistance.  Defense counsel presented a cogent defense and, through skillful cross-examination, exacted admissions from the crucial prosecution witnesses that furthered the defense theory.  Most notably, he succeeded in getting D.H. and F.H. to admit that they did not

24

have a good relationship with petitioner and in getting Garcia to corroborate that. He also exposed subtle inconsistencies between F.H.'s and D.H.'s accounts of whether their parents' bedroom door was open or closed, where petitioner and J.A. were positioned on the bed, and which direction they were facing. This enabled defense counsel to argue that D.H. and F.H. fabricated their testimony about having caught their stepfather in the act of abusing J.A.

Similarly, defense counsel, adroitly noticing that the six-year-old complainant had used the term "dick" during her direct examination, succeeded in getting J.A. to testify that one of her brothers taught her this slang term for penis. Defense counsel may have asked one question too many when he inquired whether that brother was F.H. and learned that it was seven-year-old C.A. However, the decision to ask that question was unquestionably strategic and not at all unreasonable, since testimony that F.H. – who had several minutes alone with J.A. after the incident – had taught her this term would have strongly supported the inference that F.H. had coached her into accusing petitioner.

Petitioner does not fault trial counsel's theory of the case. Rather, the *pro se* supplemental brief largely lists strategies which the lay petitioner incorrectly believes would have furthered that strategy. First, petitioner argues that defense counsel should have interviewed every person who questioned J.A. to determine if suggestive questioning affected her testimony. (Supplemental Brief (Doc. No. 9-6) at 14.) But the people listed in the Supplemental Brief – a Licensed Clinic Social Worker and a doctor who saw J.A. at Richmond University Medical Center; an employee of the Jane Barker Child Advocacy Center who saw J.A. on May 31, 2012; and an ACS Worker – all spoke with J.A. *after* she told EMT McCarthy that petitioner put his "thing" in her butt. Accordingly, even assuming that trial counsel never interviewed these witnesses – and there is no proof that he did not – those interviews could not

establish that their suggestive questioning prompted J.A. to accuse petitioner of sexually assaulting her.

For this same reason, petitioner's claim that defense counsel was deficient in failing to introduce expert testimony about "fabrication, suggestibility, and other alternative explanations for the child's testimony or behavior," (Supplemental Brief at 16, 21), is entirely without merit. Petitioner was indigent, as evidenced by the fact that defense asked for, and received, daily transcripts pursuant to New York County Law art. 18-B. (3–4.) Since petitioner could not afford to retain an expert himself, defense counsel would have had to establish that an expert was "necessary" in order to persuade the trial judge to authorize him to retain one. *See* N.Y. County Law § 722-c. However, there was no evidence that J.A. had been subjected to suggestive questioning or coercion prior to her statements to EMT McCarthy. Indeed, F.H. and D.H. denied having ever spoken to J.A. about the incident. Accordingly, defense counsel had no basis for arguing that an expert was necessary.

Moreover, even if defense counsel had been able to retain an expert, it is unclear whether such an expert would have been permitted to testify. "As a general rule, the admissibility and limits of expert testimony lie primarily in the sound discretion of the trial court." *People v. Lee*, 96 N.Y.2d 157, 162 (2001). That court must "determine when jurors are able to draw conclusions from the evidence based on their day-to-day experience, their common observation and their knowledge, and when they would be benefited by the specialized knowledge of an expert witness." *People v. Powell*, 37 N.Y.3d 476, 490 (2021) (quoting *Lee*, 96 N.Y.2d at 162). The Court of Appeals has noted that there is "good reason" to exclude expert testimony regarding the credibility of a class of witnesses "on the ground that it overdevelops a collateral

matter and tends to obscure the real issues" in the case.  *See People v. Williams*, 6 N.Y.2d 18, 27 (1959).

Petitioner's third claim, that defense counsel failed to investigate what occurred during the time that J.A. was alone with her half-siblings after the incident, is also meritless.  Defense counsel's cross-examination of F.H. established that he was alone with J.A. immediately after the incident.  However, when defense counsel attempted to establish that F.H. and/or D.H. spoken to J.A. about the incident, both F.H. and D.H. flatly denied having done so.  It is unclear what defense counsel could have done to discredit this testimony.  Thus, establishing a more precise timeline of events following the incident might have established that F.H. and D.H. had the opportunity to coach J.A., but would not have permitted the inference that they actually told her what to say.

Petitioner's fourth claim, faulting defense counsel for failing to investigate and highlight the lack of medical evidence of sexual abuse, ignores the facts of the case.  In his summation, defense counsel specifically noted the "lack of medical evidence … [of] any injuries."  (177.)  In support of this argument, he read extensively from the medical records of J.A.'s examination at Richmond University Medical Center, noting that the nurse's assessment showed "basically a negative examination," with no evidence of injury or distress.  (178–79.)

To be sure, defense counsel did not himself introduce any medical evidence.  Rather, he argued on summation that the prosecution had the burden of proof and had failed to introduce evidence relating to the May 31, 2012, examination or any "other evidence, scientific or medical, which shows that anything happened here."  (180.)  This was a sound strategic decision.  According to the Supplemental Brief itself, Rose Mary Daniele wrote in her report that although

the May 31 examination was normal, such findings did not preclude abuse and that her "medical diagnosis" was "Child Sexual Abuse." (Supplemental Brief at 19.)

Petitioner's fifth and final claim faults defense counsel for failing to preserve the legal sufficiency argument for appellate review. The Court need not consider whether this failure constituted unreasonable performance because petitioner cannot make out the second prong of the *Strickland* test with respect to this claim. *See Strickland*, 466 U.S. at 697 (when "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice [than on the ground of objectively unreasonable performance] … that course should be followed.") To satisfy the second prong, petitioner would have to "show that, but for his counsel's failure to preserve his sufficiency claim, there is a reasonable probability that the claim would have been considered on appeal and, as a result, his conviction would have been reversed." *Parker v. Ercole*, 666 F.3d 830, 834 (2d Cir. 2012). In this case, the Appellate Division considered the merits of petitioner's legal sufficiency claim and held that the evidence, viewed in the light most favorable to the prosecution, was legally sufficient to establish petitioner's guilt beyond a reasonable doubt. "Given that the Appellate Division reviewed the claim that the evidence was legally insufficient …, [petitioner] cannot claim that counsel was ineffective in failing to preserve the issue for appeal." *Bierenbaum v. Graham*, 607 F.3d 36, 57 (2d Cir. 2010).

## CONCLUSION

For the reasons set forth above, the instant petition for a writ of habeas corpus is denied and this action is dismissed. A certificate of appealability shall not issue because petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2). The Clerk of Court is directed to enter judgment in accordance with this

Memorandum and Order, to mail a copy of the judgment and this Memorandum and Order to petitioner, to note the mailing on the docket sheet, and to close this case.

SO ORDERED.

Dated:  Brooklyn, New York
        September 30, 2022

*Roslynn R. Mauskopf*

_____

ROSLYNN R. MAUSKOPF
United States District Judge